[Civ. No. 1515.   Third Appellate District.—June 19, 1916.]

JOHN A. SOULE, Respondent, v. LOTTIE M. WYATT
et al., Appellants.

ACTION TO SET ASIDE DEED—FRAUD AND UNDUE INFLUENCE—SUFFI-
CIENCY OF EVIDENCE.—In this action to have set aside and declared
void a deed made by an aged father of all his property to one of
his daughters to the exclusion of his other children, on the ground
that the execution of the deed was procured through the frauds and
misrepresentations of such daughter, and by the undue influence
exerted by her upon him at a time when he was enfeebled in
mind and health and incompetent to make a deed or dispose of his
property, it is held that the findings that the allegations of the com-
plaint were true are supported by the evidence.

APPEAL from a judgment of the Superior Court of Yolo
County.   N. A. Hawkins, Judge.   ·

The facts are stated in the opinion of the court.

E. S. Bell, for Appellants.

W. A. Anderson, George Clark, and Black & Clark, for
Respondent.

CHIPMAN, P. J.—Plaintiff commenced the action to set
aside and have declared void a certain deed conveying to his
daughter, Lottie M. Wyatt, one of the defendants, certain
real property situated in the town of Washington, Yolo
County, on the ground that "said deed was procured to be
executed by the said defendants through the frauds and mis-
representations of said defendants, and by the undue influence
exerted by the said defendants upon the said plaintiff at a
time when he was enfeebled in mind and health and incompe-
tent to make a deed or to dispose of his property," and that
"plaintiff's title to said property be quieted against said de-
fendants and each of them."   The cause was tried by the
court and plaintiff had judgment in his favor, from which
defendants appeal.

The court made the following findings of fact: "1. The
court finds all and singular the allegations of the plaintiff's
complaint to be true.   2. That the attorney who prepared

the deed for the signature of the plaintiff was in no manner a party to the plan under which the said defendants procured the making of said deed, and the said attorney acted wholly without knowledge of the manner in which defendants did procure the making of the said deed by the said plaintiff.''

Plaintiff was a pensioner of the Southern Pacific Company in 1911, residing on the premises in question in the town of Washington, sometimes called Broderick. His family consisted of his wife and grandchild, Flossie Conrad, daughter of defendant Lottie Wyatt by her first husband. When Flossie was an infant she was taken into plaintiff's family and reared as their own child. Plaintiff was seventy-seven years old and was suffering grievously with a painful disease of the eyes, and finally lost the sight of one of them. He was feeble from the infirmities of age and was afflicted with heart trouble, which at unexpected moments would cause him to lose consciousness and fall to the ground as in a fit, lying there rigid "and as though dead," as one witness described his condition. On July 13, 1911, his wife died and Flossie's mother took Flossie away to her own home at Rutherford, Napa County, and plaintiff went to the home of his son, Charles C. Soule, in Broderick. The loss of his wife, the taking from him his grandchild, Flossie, to whom he was devotedly attached, together with the excruciating pain caused by the disease of his eyes and his general weak physical condition, so affected plaintiff as to make him an object of pity and commiseration. He was ill for some time after the death of his wife. He testified: "I lost my eyesight, then worrying about my wife and my baby [he called Flossie "his baby"] that I thought a good deal of took away from me, and all things together made me sick, that is about all I can remember at the present. . . . Q. What effect, if any, on your feelings or your mind did the death of your wife and the breaking up of your family have? A. Well, it made me what you might say crazy; in fact, I think I am so yet." He visited his daughter, Mrs. Wyatt, occasionally for some time after his wife's death. "Q. What took you down there, what was the cause of your going? A. Well, in the first place I didn't want to go down; I rather be at my old home, it is natural, but they took my baby away and caused me to go down there, my daughter did, thought if I would come down there I would be better off where Flossie was, and so I made up my mind

I would go down there; I like to be where she was, so I went down and stayed there a while and came back awhile and kept going."

The deed in question was executed on July 30, 1912, three weeks after he went to Rutherford to live with defendants. He testified as to his then physical condition as follows: "I was pretty sick; I was weakened down, discouraged, my eyesight was failing, and I felt weak; one-half of the time I couldn't rest nights; they gave me whisky with some stuff in it to make me sleep, one thing and another, so, therefore, I got pretty weak for quite a while, but I got better." Several witnesses testified to his weakened condition; that his eyes gave him great pain; that he was subject to fainting spells from heart trouble; that he constantly grieved, "and was brooding" over the loss of his wife and having his granddaughter taken from him. Besides defendant, Mrs. Wyatt, his children were Mrs. Annie Lindsay and two sons, Charles C. and John G. Plaintiff testified that after he came to Rutherford, and before the deed was made, defendant Mrs. Wyatt told him she learned through two letters written to Mrs. Addie Barry, residing at Rutherford, sister to plaintiff's deceased wife, that his son John and Mrs. Lindsay were going to get all his property. "She [Mrs. Wyatt] said they were going to have it all, them two, and I remarked I didn't want them to have it all. I wanted to divide it amongst the four of them."

Mrs. Barry testified that this representation by Mrs. Wyatt was false and that Mrs. Lindsay had not written any such letter. Plaintiff testified: "Q. What did she keep saying to you? A. She say they made their brags they were going to have it all because they done the most work on it. I admitted they did, but at the same time I didn't think it was right for them to have it all. Q. What did you say on the subject of dividing your property? A. I say I wanted to divide it, want it equally divided. Q. What way? A. Each one of them to have their share. Q. Where and when did you tell her that? A. Well, about the time we were talking about it; I don't know exactly when it was. Q. But it was before the deed was made? A. It was before the deed was made. Q. Was anything said by her when you stated you wanted to divide it up among them all? A. Well, she said I couldn't do it, because they were going to have it all, Annie

and John was; of course, I couldn't divide it if them two going to get it all, and I didn't like that idea. Q. Was anything said about a will? A. Yes, sir; I did. Q. What did you say? A. I said, 'Well, then I will fool them; I will make a will, then they can't get any more than the others'; and she said, 'A will can be broke.' Q. Where was her husband during the talk? A. One time we were talking about it, I couldn't say at the dinner-table or supper-table, talking about the will, and she turned around and says to Harry— we call him Harry—'A will can be broke, can't it?' and he says, 'Yes.' That finished it for that evening. Q. At that time you were living down there? A. At that time I was living down there. Q. That was before the deed was made? A. That was before the deed was made. Q. At the time of that talk about saying a will could be broke, was anything said about a deed? A. Yes. Q. Who said it? A. She said a deed—no, he said a deed would be the best, because can't break a deed. Q. What did she say, if anything? A. I don't remember she said anything, in reply to that or not at that time, but talked about it afterward, but not at that time. . . . Q. After these talks you have referred to was there any further talk between you and them regarding your property and disposing of it in any way? A. Why, about. making the deed? Q. Yes. A. Well, she said—I said, 'Well, if a will can be broke, I would like to have Charlie and you and Flossie have a share of it, because if the rest want it all that looks kind of hoggish to me; they so mean probably they won't get any of it.' So she says, 'Well, you can't mention Flossie because what belongs to me belongs to Flossie.' 'Then I will make it in your and Charles' name.' 'Well, you can't make it in two names; have to make it in one; make it in my name, then I can give Charlie his share.' 'What is his share?' 'Well, I will give him a thousand dollars.' 'Well, he ought to have more than that.' 'Well, but I have to take care of you.' 'Take care of me? I don't want any care. I will go to the county hospital if the worst comes to the worst.' Q. You stated she said something about making out a deed in more than one name? A. She said you couldn't make it in more than one name. Q. Did you believe those statements? A. I believe it; yes, sir; I didn't know any better. Q. How long before you went up to Mr. Bell's office was it this talk occurred that you mentioned? A. How long before?

Q. Yes.    A. It might have been—well—I will say about three weeks; I don't know if it was quite as much as that, but say three weeks; I can't remember these things right up to a date. Q. How often was the matter of deeding your property talked over?    A. Oh, every little while get to talking about it until at last I got tired; I say I never had anything; in fact, I ain't got nothing; I couldn't handle it to suit myself; I was getting tired and sick hearing them talk about it.    Q. When the talk occurred or the talks occurred about the making of a deed, was there anything said regarding disposing of the property after the deed was made?    A. Yes.    Q. What was said?    A. She says, 'Papa, you make it in my name; you know you are pretty sharp on a bargain and you can sell it any time you like, and all I have got to do is sign the papers,'· so, of course, I thought I could have that privilege.    Q. How long before you actually signed the deed did she make that statement to you?    A. How long before?    Q. Yes, the first time she made that statement to you.    A. Well, I don't remember that, I would like to tell it as near as I can remember.    Q. But you know it was before the deed—you know it was before the deed was made?    A. Yes, it was before the deed was made, then after the deed was made, Mr. Joe Harbinson, a wholesale liquor man in Sacramento, wrote me a letter —of course, I can't read—he would have given me two thousand five hundred dollars cash for my property, and I laughed about it, and I said, 'Flossie'—or at least 'Lottie'—I got Flossie on the brain, no wonder—'Lottie, write a few lines to Mr. Harbinson and I will tell him what I will take for the property,' and she jumped up and she commenced cussing and swearing, 'To hell with him!    I don't want to sell it, I don't want to sell it.'    Says I, 'If he gives me what I ask for it, isn't that satisfactory?'    'No, I won't sell it.'    I says, 'Write a few lines anyhow.'    'No.'    Wouldn't do it. . . . .    Q. When this statement was made to you about making the deed to one person only did you make any statement to your daughter about the fact that you might want to sell this property?    A. Yes.    Q. What did you say to her in regard to that matter?    A. I told her I would like to sell it; she said I could sell it any time I liked because I was pretty sharp on a bargain.    Q. I will ask leave to ask this question though it is leading.    Did you say to her, 'I said I didn't like to deed it because then I can't sell it?'    A. Yes, sir; that

is what I am coming at, and she said, yes, I could.  Q. She stated yes, you could?  A. Yes.  Q. Did you believe that statement she made to you?  A. Well, I never dealt much with buying and selling, of course.  Q. What I mean is this: did you rely on the statement she made to you?  A. Certainly.  Q. Believed it?  A. Certainly; I thought she meant what she said at the time; if I didn't I wouldn't have done it. Q. Was the getting of an attorney to fix up the deed mentioned?  A.  She says she get Mr. Bell; he was a good hand to do anything like that because he done all the work for her husband when his mother died, and he understood it thoroughly, so Mr. Bell did do it.  Q. Did you still believe and rely on those statements when you signed that deed?  A. Yes, sir; I believed what she told me; I believed she thought she was telling what she meant.''

Mrs. Soule, wife of Charles, with whom plaintiff lived after the death of his wife, testified: ''Q. Do you know whether while the old gentleman was living there in the town of Washington he was worried or grieved?  A. He grieved all the time; every minute of his life he grieved from the time he would get up, over his wife's death, and being left without his baby, as he called Flossie.''  She testified to his being kept in a dark room on account of his eyes—''he was suffering terrible day and night, got up at all hours of the night; that was just before he went to Rutherford. . . . Q. Did anyone coming from Rutherford make any requests that he go down there?  A. Yes; Flossie came for him, begged him to go down to mother, when he was sick, begged him, says, 'Mam told me to tell you to come, come down to her, that is the place'; he said, 'No, I don't want to go, I want to stay here,' nobody could take care of him like Madge; he imagined I could take care of his eyes because I had been doing it, I guess.  Q. Did you have any talk with Lottie M. Wyatt about the time of his going down there?  A. Oh, yes, she would talk—the time when she came to get him after he went down for the short visit then she came up to take his things down. Q. Did you have any talk with her, particularly with reference to any dealings she might have with him, what she might accomplish with him?  A. She was talking to me, she said, 'They think they are going to get it all, but wait until I get him down there, you bet I'll get it.'  Q. When was it she said that to you?  A. When they were taking the furniture,

the day before. Q. Did she ever say anything to you about any particularly scientific way of handling the old gentleman? A. No, only just when the other daughter was talking to him, they were fussing, she said, 'You can't ruffle his feathers; you have to smooth him down the right way and you can do anything you want with him.' Q. She said that to you? A. Yes. Q. In the town of Washington? A. Yes. Q. Before he went down there to live? A. Yes, when he was getting ready to go. Q. Did the old gentleman in his talks with you ever make any statement before he went down there as to the way in which he wanted to leave his property? A. It seemed like that was on his mind all the time, yes; he wanted share and share alike, 'They are all my children.' Q. Did they write any letters to Washington asking him to come down there? A. Yes, she wrote about every day when he was so bad, begged him to come down.''

On cross-examination she testified: ''Q. Didn't you tell anyone she had told you this? A. No, they all seemed—I wasn't interested in it, it was nothing to me; they never took me much into their affairs; she was talking to me in bed; she wanted to know if father would give Charlie anything—'what do you think he would do with it?' I says, 'I don't know.' She says, 'I bet if he did give him anything he would blow it in.' I says, 'I don't know.' She says, 'I'll tell you what I think he would do, he would take a long trip.' Q. She said if she got him down to Rutherford she would have it all? A. She was speaking of the other two; she said they wanted it, the other two, the daughter and son, they wanted it because they helped make it—'If he lives a week after I get him, I'll see they don't get it.' ''

A letter written by defendant Mrs. Wyatt was identified by the witness. This letter was addressed to ''Charles C. Soule, Broderick, Yolo Co., Cal.,'' also postmarked Broderick. It was dated three days after the deed in question was executed and was as follows:

''burn this. Rutherford, Aug. 2, 1912.

''Dear Brother: I just received you most welcome letter. We are always glad to hear from you. Pa seems to think he ought to hear from you every day now we are all fine and hope you are all the same well we are not surprised to know that she comes every day but Charley you don't have to put up with that you can do just as you like in that house and

make her stay away and I would do so to I would not let her come there and worry Mady so I know she must get tired hearing her tongue run and she has got so she lies pretty good to now, Charley don't do anything to give her a chance to get you in any trouble you know she would only be to glad to see you in trouble and I guess that is what she is trying to do she said all she could to get me started but I was to smart for her she tells everybody I am crazy but she will soon think I am about as smart as she is when she finds how things are now Charley I don't want you to worry you will get what belongs to you some day we went to Napa Tuesday and the deeds are made so it is you and I for it we got one they cant brake to the only way they could is to prove he was not in his right mind when he did it now that Pa is a resident of Napa Co all they could do would have to be done here and they can never prove that he aint in his right mind Papa says he don't want you to worry about anything he say you are his and you shall have what is yours say he wants you to bring him the two canes they stand in his room up stairs and the hook Polly had to hang his cage on so don't forget it he talks about them so much now I guess she wants to make trouble between Madge and I but if Madge listens to her she will have plenty to do she can lie pretty good well I have got the flower picture ready to send to John Pa changed his mind about keeping it so I will send it to him Annie will get left if she thinks the things I brought will ever be sent back I guess you will hear her all over town when she sees the deeds published in the Woodland paper I guess Mrs. Snider takes it they will say to you yes Lott got it and you will get left but Charley dont believe all you hear I want you to know you have one who will do right by you and I must say Madge treated me very nice and Pa says he will never forget how good she was to him. he eats good and sleeps good and seems to be so happy we do all we can to please him and we always will he is a good old father he had beans for breakfast this morning well I will go to bed it is late and I am tired now write soon love to all dont get in trouble with that *devil*

"your loving sisted

"Lottie.

"When you hear about the deeds just say Lot said she thought she would bye it as it was her old home."

A fragment of another letter written by defendant Mrs. Wyatt to Charles Soule read:

"he thinks he will come home sunday I sent the picture to him so his Polly can have it to look at I fixed Pa room up and it looks fine he eats good and sleeps good well Kid I don't know what could be rong with my last letter you say you don't understand it I told you he deeded it to me at least I intended to tell you so I know you must feel lonesome at time not seeing mother or father there but Father can go there to see you but our dear old mother we must give up we cant have her any more in this life I would not be surprised to see John and Annie try to brake the deeds but they will have a hard time doing it they would have to prove Pa was not in his right mind when he did it that would have to be done here so I am not afraid of it now if you dont come sunday why write and tell us the news love to you both

"Your loveing sister
"LOTTIE."

It appeared that plaintiff went to Napa with Flossie on July 3d and returned with her mother after the 4th, when they packed the furniture and returned shortly afterward to Rutherford. The deed, as we have seen, was executed on July 30th. As to the circumstances attending the execution of the deed plaintiff testified: "Q. Who accompanied you to Mr. Bell's office when you went there, who went with you? A. Her husband, Harry Wyatt. Q. How did you get up the steps? A. She and him went together, he took me by the arm, helped me upstairs and downstairs through a hall; that is all I can remember about it. Q. At this time did you have anything over your eyes? A. Yes, sir. Q. What? A. I had my specs, I had a shade, and I had the rim of my hat over my eyes because the light bothered me a good deal. I got the same shade now at home. Q. Tell us as near as you can remember what occurred in Mr. Bell's office. A. Well, as near as I can remember, come there, says I come there to make a deed out, deed my property over to my daughter; of course, Mr. Bell knowed it; it was all understood beforehand, him being there, talked about it, had to go get Mr. Bell ready to attend to business. Mr. Bell: I move to strike out what Mr. Bell knew. Mr. Clark: We consent. The Court: Stricken out. Mr. Clark: Q. Was the deed made out when you got there or made out afterward, do you know? A. Made right

away, right there while we were there. Q. Do you remember whether it was read over to you? A. Read over to me? Q. Yes. A. No, sir, I don't remember any such thing. I didn't know it was sold for $10; that was never mentioned to me. If they did I think I would have kicked, I would have thought there was something kind of funny. Q. Did you sign your own name? A. Yes; I signed it myself; I made a cross with a pen. Q. What was done with the deed afterward? A. Well, as near as I can remember, I think Mr. Bell kept it and sent it to Woodland to get it recorded; I think that is about the way it went. Q. Did you know it was going to be recorded at the time? A. I know it was going to be recorded; yes, sir.'' He testified further: ''Q. What was the manner of their treatment toward you, Mr. Soule, before you made this deed, the family, what way were you treated in the Wyatt family before you made this deed? A. The reason I didn't what? Q. What was the manner of their conduct toward you before you made this deed; how did they treat you when you were down there? A. They treat me very kind; they couldn't do enough for me; treat me very kind, very kind indeed; I felt so sick I was like a child; you take a child, if he sick you pet it, make over it; that is just what he likes; that is just like me. Q. How far was the little room you slept in from the house? A. The room I slept in joined the saloon; I should judge about fifteen feet from the house, about that. Q. How was it about calling you to your meals, before the deed was made? A. The bell would ring; I didn't very often hear the bell; I am a little hard of hearing, but they tell me; we go along like two good friends, so with us; open the screen door, open the other door, I go in ahead of him, he come in behind, shut it, sit down at the table, he wait on me, everything I had nice. Q. How was their treatment of you after the deed was made? A. Well, I commenced thinking that things didn't go quite so sociable, didn't look exactly right— 'Did you hear the bell?' 'No, I didn't hear it.' 'Well, dinner ready. Ain't you going?' 'I be there pretty soon.' Sometime he go when I did, sometime he didn't. When I got in the house his wife waited on me; I see he knocked off waiting on me; I thought it kind of funny; I thought all that but said nothing, but I noticed it. I was getting quite smart at that time, wasn't quite so sick; I was noticing things a little mite more. Q. How did you spend your time over

there? A. Sitting in front of the saloon. I was figurehead for the saloon; had nowhere else to stay unless I stay in the house. Q. The saloon was a short distance from the house? A. Saloon just about—the front door of the saloon and the front door of the house was about sixty or seventy feet off, say sixty or seventy feet from the saloon door. Q. Mr. Wyatt was running this saloon there? A. Mr. Wyatt was running this saloon there. Q. Your room was built on to the saloon? A. My room was built on to the saloon; one door open into the saloon, and one door open out in the back yard, one door open out in the street—three doors to the room. Q. Before the deed was made would they read to you? A. Well, I used to buy a paper called the 'Yolo Independent'; I didn't buy it for me, bought it for my granddaughter; she wanted to hear the news from home where she was brought up and so on, but I wanted to hear the news, and they took the 'Bee' and they used to read the news right away as soon as they would get it, and I was anxious to have it read, but somehow or other afterward, they were not so anxious to read it to me—'I ain't got time now, Pa.' 'I seen so and so happened in Washington.' 'Where did you see that?' 'I saw it in the paper.' 'Why didn't you read it to me last night?' 'I seen it since,' and that is all I know about it. Q. Did you ever suggest to them that they read to you? A. I used to ask them; yes, sir. Q. Was this expression ever used, 'Oh, to hell with you! I haven't time to read the paper?' A. No, she didn't say, 'To hell with me.' Q. What did she say? A. 'Oh, to hell with the paper! I ain't got time to read it.' Q. That was after the deed was made? A. After the deed was made. Q. How about writing for you? A. My son-in-law, when he go anywhere, always very kind to ask me to go with him; sometimes I go, sometimes I didn't, but I don't remember—he might—but I don't remember him asking me to take a ride with him after the deed was made. Q. I mean writing, how about their writing for you? A. Why, she wouldn't write for me. Q. What did she say? A. One time they were raising the old Harry in Washington, the West Land Company made a fence on the line—my boy was running the house, he keeps writing down, so I says to my daughter one night, I says, 'Lot, write me a few lines to Charlie and tell him to put the fence where it belongs; let him put it himself and take the fence there; that is mine, I

bought it; that will do for firewood.' She jumped up and threw up her hands and cussed and God-damned—'God damn the place! I wish I never seen it; it is a damned bother to me; "Write to Charley, write to Charley"; I am God damned tired writing, writing.' I said, 'Well,' I says, 'for God's sake, did your mother learn you that?' 'I don't give a God damn; all I can hear is "Write to Charlie, write to Charlie"; I am going to sell the damned place.' 'Well,' I says, 'if you don't want it, if it is a bother to you, give it back to me.' 'Not by a God damned sight; what am I going to have for taking care of you?' I says, 'It never cost you anything; you needn't take care of me; I can take care of myself or the county hospital can, but the place never cost you a nickel and you know it.' I paid all the taxes on that place since I owned it, up to this year, up to date.''

There is but little, if any, conflict as to the physical condition of plaintiff prior to and after his wife's death and the making of the deed. There is no direct testimony that he was so weak-minded as to be incapable of understanding such a transaction as that of conveying his property to another, except as such an inference might be indulged from his physical and mental sufferings as testified to by many witnesses. Attorney Bell testified that plaintiff came to his office with defendants unsolicited by him. He had been attorney for defendant Harry Wyatt but had never before seen plaintiff. Defendant Harry Wyatt telephoned him that plaintiff wanted him to transact some business and was told to bring him to witness' office, which defendants did in the afternoon of July 30th. Witness testified that plaintiff was introduced to him by defendants and he thereupon stated his business, which was that he wanted to convey his property to Mrs. Wyatt; that witness explained to him fully what a deed meant, and that if he signed it he would lose all control of the property; that he had no form of gift deed and used the ordinary bargain and sale form; that he asked plaintiff if he knew what he was doing, if he had any other children and what other property he had; that plaintiff told him he wanted to give the property to Mrs. Wyatt; that he said he could not write but he touched the pen and Mr. Bell and a clerk in an adjoining office witnessed the signature. He testified: ''I said to Mr. Soule, 'What do you want done with the deed, Mr. Soule?' He says, 'I want you to give it to Lottie, my

daughter.' She was still sitting here at the corner of the desk. I reached it over to her. She says to him, 'Do you want me to record this, Pa?' something to that effect. He said, 'Yes, I do.' " Mr. Bell had the deed recorded and later sent it to Mrs. Wyatt. Plaintiff testified that he had no recollection definitely of what took place at Mr. Bell's office except as shown above. There is nothing in the record to cast doubt upon the truthfulness of Mr. Bell's testimony. It is quite conceivable, however, that plaintiff did not fully comprehend the effect of what he was doing and was not impressed by what was told him. His understanding was, as he testified, that he was not parting with control of the property or with the title, and that he knew nothing to the contrary until some time after the deed was made when his daughter claimed to own the property. He received one offer for the lot by letter and spoke to his daughter about selling it, and was then told it belonged to her and he could not sell it. This was all the property he had, and he repeatedly expressed his desire that his children should share it equally.

Appellants rely upon *Soberanes* v. *Soberanes,* 97 Cal. 140, [31 Pac. 910], "in which," it is claimed, "the circumstantial facts are almost identical with those in the instant case." The court said in that case, among other things: "The transfer of an aged mother by way of gift of all her estate to one of her sons to the exclusion of all her other children will not be set aside as constructively fraudulent, where it appears that the gift was made freely and voluntarily, and with full knowledge of all the facts and comprehension of the nature and effect of the transfer, and in the execution of a purpose long entertained by her, originating in a desire to show her appreciation of the son's devotion and services and without any undue influence or fraud on his part, although, by reason of her illiteracy and want of experience and knowledge of business affairs, she was not able, unassisted, to take care of her property, and by reason thereof was liable to be deceived and imposed upon by designing persons in the transaction of her business."

The testimony in the case now here presents a state of facts quite unlike those in the case cited. The deed was not only not made "in the execution of a purpose long entertained" by plaintiff, but in direct opposition to his frequently expressed desire—expressed, indeed, at the very time defend-

ants were suggesting that he convey the property to his daughter; nor was the deed made in appreciation of the daughter's "devotion and services," for no such consideration appears. And it may be doubted whether the deed was made "with full knowledge of all the facts and comprehension of the nature and effect of the transfer." There was testimony, accepted by the court as the findings show, from which it appeared that defendant Mrs. Wyatt conceived the plan of possessing herself of plaintiff's property before she urged him to take up his home with defendants. She said to Mrs. Charles Soule: "They think they are going to get it all, but wait until I get him down there; if he lives a week you bet I'll get it." To this same witness, speaking of how to manage plaintiff, she said: "You can't ruffle his feathers; you have to smooth him down the right way and you can do anything with him. Q. Did the old gentleman in his talks with you ever make any statement before he went down there as to the way he wanted to leave his property? A. It seems like that was on his mind all the time, yes; he always wanted share and share alike. 'They are all my children.' Q. Did they write any letters to Washington asking him to come down there? A. Yes; she wrote about every day when he was so bad, begged him to come down." It appeared that soon after plaintiff took up his residence with defendants the question of disposing of his property was brought up by his daughter, and it was she who proposed that it should be conveyed to her alone, but, as plaintiff testified, with the understanding that he retained the right to sell or dispose of it. She did not accomplish her purpose quite as soon as she said she would, but did so in about two or three weeks. The letter she wrote to her brother three days after the deed had been executed harks back to her original purpose and tends strongly to show her design in bringing her father under her own roof to live.

The complaint sets forth with much particularity the facts brought out by the evidence, and the averments were by the court found to be true. We think there was evidence sufficient to support the findings.

The judgment is affirmed.

Hart, J., and Ellison, J., *pro tem.*, concurred.